**Opinion issued June 11, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

NOS. 01-23-00201-CR
01-23-00202-CR
01-23-00203-CR

_____

**HOMERO LOPEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 339th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1721973, 1721974, 1721977**

---

## MEMORANDUM OPINION

When a late-night Cinco de Mayo celebration at a restaurant erupted into a clash between patrons in the parking lot, Homero Lopez drove his car into the crowd, causing the death of his mother and injuring two others, and then left the scene.

A jury later found Lopez guilty of murder,[1] failing to stop and render aid,[2] and failing to stop and render aid after a collision resulting in serious bodily injury.[3]

The trial court assessed Lopez's punishment at confinement for 7 years for murder and confinement for 5 years and 7 years for each offense of failing to stop and render aid, respectively. The trial court ordered that he serve the sentences concurrently.[4] It also entered an affirmative finding that he used a deadly weapon, namely a motor vehicle, in the commission of the murder.

In his sole issue on appeal, Lopez contends that the evidence is legally insufficient to support his conviction for each offense because the State failed to establish his identity as the driver of the car that struck the crowd.

We affirm the trial court's judgment in each cause number.

## Background

On the night of May 5, 2021, a group of friends gathered for dinner and drinks on an outdoor patio at Pinchy's Tex-Mex restaurant in west Harris County.

---

[1] *See* TEX. PENAL CODE § 19.02(b). Appellate cause number 01-23-00201-CR is trial court case number 1721973.

[2] *See* TEX. TRANSP. CODE §§ 550.021(a), (c)(2), 550.023. Appellate cause number 01-23-00202-CR is trial court case number 1721974.

[3] *See id.* §§ 550.021(a), (c)(1), 550.023; *see also* TEX. PENAL CODE § 1.07(a)(46). Appellate cause number 01-23-00203-CR is trial court case number 1721977.

[4] The trial court also assessed a fine of $50.00 for each offense of failing to stop and render aid.

2

Members of the group, as pertinent here, included Elvia Vega, Jimmy Hernandez, complainant Adolfo Deleon, and complainant Doria Horedia.

At around midnight, the group decided to leave and began walking out to the parking lot. Vega testified that a man who had been seated at a nearby table followed them out. She described him as having facial hair, wearing an Astros jersey, and as "look[ing] . . . not big but pretty buffed." The trial court admitted into evidence a security photograph of the restaurant patio from the night of the murder. Vega identified herself in the photograph and later identified the man, shown seated at the table next to her, as Lopez.

Vega testified that, as Lopez followed them out, he made remarks to female members of the group, who told him to move along. As the group assembled in the parking lot, another man appeared, whom she did not identify, and escorted Lopez to a nearby "dark vehicle"—the "only vehicle parked like two spaces over" from where the group had gathered. And they thought that was the last of it.

Moments later, however, a woman who had been seated with Lopez and who was later identified as Lopez's mother, Crystal Gomez, came out of the restaurant "trying to fight whoever." According to Vega, Gomez "came at" Horedia. Gomez fell to the ground, and Horedia held her down near Vega's car—a Nissan Pathfinder.

Deleon appeared and, as he attempted to lift Horedia off of Gomez, the dark vehicle "pulled away from where [Lopez] had walked" and "ran into the crowd."

3

Vega noted that the vehicle also hit her Pathfinder and pushed it into another car. The driver then "put the [dark vehicle] in reverse and left."

Vega identified Lopez during trial as the man she had seen escorted to the dark vehicle that hit the crowd. And she noted that the man who had escorted Lopez to that vehicle was still on the scene after the vehicle hit the crowd and left.

Hernandez testified that, when the group left the restaurant that night, "all of the sudden like a scuffle broke out." Tensions were high, and people were yelling. And "multiple people" gathered outside, "[r]ight in the middle of the parking lot where there's parking spaces." Gomez came over, began arguing with Horedia, and "somehow they end[ed] up on the [ground]," with Gomez "on the bottom."

According to Hernandez: "[A]ll of the sudden I just kind of . . . see headlights coming towards us. Like lights. That's when a car runs into the crowd." The car hit Horedia and "knock[ed] her underneath" another vehicle. It also ran over Gomez and struck the Pathfinder. The driver then reversed and ran over Gomez again, and then left.

Deleon also testified that Lopez had been sitting next to the group on the restaurant patio. At around 11:45 p.m., the group exited the restaurant. Lopez followed them out, trying to talk with the women. An argument ensued in the parking lot, and Horedia ended up on the ground with Gomez. As Deleon tried to

4

pull Horedia off of Gomez, a car struck Deleon, Horedia, and Gomez. The driver then "put [the car] in reverse and left the scene."

Deleon testified that, after being struck by the car, he was unable to feel his right leg. He was hospitalized for 16 days and underwent 4 surgeries, including a skin graft. And he suffered permanent damage to his knee. The trial court admitted into evidence Deleon's medical records and photographs of his injuries.

Deleon further testified that he recognized the car that had struck them as the one to which he had seen Lopez escorted. Deleon testified that there were no other cars parked around Lopez's car; it "was the only car there." Deleon saw Lopez get into the driver's side of the car, and "[s]econds" later—"three, four maximum"—they were struck by the car. Deleon identified Lopez at trial as the person he had seen getting into the driver's side of the car.

Horedia testified that she did not recall leaving the restaurant. She recalled experiencing pain on her left side and chest, speaking with paramedics, and waking up in a hospital.

Harris County Sheriff's Office (HCSO) Deputy C. Gonzales testified that, on May 6, 2021, he was dispatched to a call that a vehicle had struck multiple people in the parking lot of a restaurant in Harris County. When he arrived, he saw three people on the ground—"[o]ne was facing down, another one was facing up under a car," and "a male a little bit further east was also facing up."

5

Gomez, who was not breathing and "had no pulse," was transported to a hospital, where she was pronounced dead. Horedia was scraped up but was conscious and talking. And Deleon was conscious but had a "bone sticking out right by the aorta area" of his leg and his pants were soaked with blood.

According to Deputy Gonzales, witnesses at the scene reported that a vehicle "ran towards . . . a crowd of people." They described the vehicle as a "blue Chevy Impala," a "Kia Forte," or a "Chevy Malibu" and described its driver as "a Hispanic male wearing jeans and an Astro[s] jersey."

Deputy Gonzales testified that, during the investigation at the scene, an individual matching that description, Lopez, approached him. Lopez was "very belligerent," "pushing forward," and "asking for his mom." He had blood on his hands, and it was apparent that he was intoxicated.

Deputy Gonzales examined the vehicle Lopez was driving—a "dark blue" Chevy Malibu parked at the entrance to the parking lot. He noted that there was no one else in or around it. Deputy Gonzales testified: "On the hood I observed hand prints and as I looked by the grill[e] guard I observed speckles of blood and under the vehicle by the drive train on the front there was also blood under the vehicle." The trial court admitted into evidence photographs of the hood and front of the Malibu—showing lines in the dust sweeping down the hood and the front of the car. Deputy Gonzales testified: "Those are the handprints I was talking about."

6

HCSO Deputy T. Williams also testified that witnesses identified the suspect as "wearing a blue Astro[s] jersey." And, during the investigation at the scene, Lopez, wearing a "blue button up Astro[s] jersey," approached a group of officers from outside the secured perimeter and "asked about his mother." An officer asked where Lopez was coming from, and he pointed to a dark-colored sedan parked at the entrance to the parking lot. Based on his examination of the sedan, Deputy Williams testified: "[W]hat I saw [was] it was a dirty hood. It was dry. It was a dirty hood and I observed hand prints sliding down on the front driver portion of that hood."

HCSO Investigator T. Davis testified that, at the scene, he noted damaged vehicles in the parking lot—with one of the vehicles "actually pushed into the other vehicle"—and bloodstains on the ground. Multiple people had been hit, and it was "apparently intentional." Investigator Davis testified that the Malibu had "apparent front end damage," which he described as follows:

> It's minor and there was some apparent blood on the front bumper and then on the hood you can see where the dust is where it's been disturbed. It looks like something had been—possibly a person dragged across the front. You can see the hand marks.

He also noted that the grille was damaged and that pieces had fallen "inside" the car.

HCSO Deputy B. Troyer testified that the Malibu had "soft contact damage" that he "would attribute mainly to a pedestrian." He noted that "[t]here was some blood in that same damaged area," and he discussed "wiping of the dust . . . off the

7

hood" that "appeared consistent with contact with a pedestrian." From his investigation, he "determined it definitely did hit a pedestrian."

Deputy Troyer further testified that, based on the Malibu's direction of travel in the parking lot and manner in which the Pathfinder was pushed into another car, the act of driving the vehicle into the crowd "seemed intentional"—"because that wouldn't be a way that you would go unless you intended to drive that way." He noted that a Chevy Malibu weighs "[j]ust over 3000 pounds" and that driving a 3000-pound vehicle into a crowd of people is an act clearly dangerous to human life and one that can cause serious bodily injury and death.

HCSO Detective A. Vara testified that the Malibu sedan was registered to Lopez. Lopez was detained and, during an interview at the sheriff's office, he identified the decedent, Gomez, as his mother.

According to Detective Vara, Lopez offered three different versions of the events. He first denied that he had been at the restaurant. In another version, he admitted that he was there and that an argument had ensued but asserted that he was assaulted by several men. Detective Vara noted that Lopez showed no injuries consistent with having been assaulted by several people.

In yet another version, Lopez admitted that he was at the restaurant, recalled that his mother had gotten into a fight in the parking lot, and admitted that he had gotten into his vehicle to leave. He claimed, however, that he then "blacked out."

8

Dr. P. Gumpeni, Deputy Chief Medical Examiner for the Harris County Institute of Forensic Sciences, testified that Gomez died from multiple blunt force injuries to her head and torso, which damaged internal organs. And she suffered multiple rib fractures that punctured her lungs. Dr. Gumpeni testified that Gomez's injuries were consistent with having been run over by a motor vehicle.

At the close of trial, the jury found Lopez guilty of murder in the death of Gomez; guilty of failing to stop and render aid to Horedia; and guilty of failing to stop and render aid to Deleon after a collision involving serious bodily injury.

**Sufficiency of the Evidence**

In his sole issue, Lopez contends that the evidence is legally insufficient to support his conviction for each offense because it does not establish his identity as the driver of the car that struck the respective complainant.

*Standard of Review*

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). In assessing the legal sufficiency of the evidence under the *Jackson* standard, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential

9

elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

In conducting our review, we defer to the responsibility of the factfinder to "fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quoting *Jackson*, 443 U.S. at 318–19). The jury, as the sole judge of the facts and credibility of the witnesses, may choose to believe or disbelieve any witness or any portion of their testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012).

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013). If the cumulative force of all the incriminating circumstances is sufficient to support the conviction, each fact need not point directly and independently to guilt. *Hooper*, 214 S.W.3d at 13.

"The key question is whether the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Morgan v.*

10

*State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (internal quotations omitted). And our role on appeal is "restricted to guarding against the rare occurrence when a fact finder does not act rationally." *Id.* (internal quotations omitted).

### Murder of Gomez

A person commits the offense of murder if he "intentionally or knowingly causes the death of an individual," or if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(1), (b)(2).

A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b); *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) ("Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death."). A jury may infer intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from its use. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996).

"Identity may be established by the testimony of a single eyewitness." *Gibbs v. State*, 555 S.W.3d 718, 728 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *see*

11

*also Shah v. State*, 414 S.W.3d 808, 812 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) ("It is well-established that the testimony of a sole witness to an offense may constitute legally sufficient evidence to support a conviction."). Further, identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence. *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018); *see also Greene v. State*, 124 S.W.3d 789, 792 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) ("[E]yewitness identification is not necessary.").

Here, there was testimony that Gomez was twice run over by a motor vehicle. Deputy Gonzales testified that, when he arrived at the scene, Gomez "had no pulse" and was unresponsive. Dr. Gumpeni testified that Gomez died as a result of her injuries, which were consistent with having been run over by a motor vehicle. Thus, the testimony supports the jury's determination that Gomez's death was caused by being run over by a motor vehicle. *See* TEX. PENAL CODE § 19.02(b)(1), (b)(2). And Lopez concedes in his brief that the State's proof establishes that Gomez was struck by a vehicle and that the collision caused her death.

In addition, Deputy Troyer testified that, based on the vehicle's direction of travel in the parking lot and manner in which the Pathfinder was pushed into another car, the act of driving the vehicle into the crowd "seemed intentional"—"because that wouldn't be a way that you would go unless you intended to drive that way." He noted that a Chevy Malibu weighs "[j]ust over 3000 pounds" and that driving a

3000-pound vehicle into a crowd of people is an act clearly dangerous to human life and one that can cause serious bodily injury and death.

Based on the evidence, the jury could have reasonably inferred that the driver of the car that hit Gomez acted intentionally or knowingly in causing her death or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused her death. *See* TEX. PENAL CODE § 19.02(b)(1), (b)(2); *see also Couthren v. State*, 571 S.W.3d 786, 789 (Tex. Crim. App. 2019) (motor vehicle can be found to be deadly weapon if used in manner capable of causing death or serious bodily injury); *Jones*, 944 S.W.2d at 647 (jury may infer intent to kill from use of deadly weapon).

On appeal, Lopez argues only that the evidence failed to establish "who drove the offending vehicle." He asserts that "[n]o one accurately identified [his] vehicle as the car causing the collision" and that "[n]o one identified [him] as the driver of the vehicle, or placed him in the vehicle at the time of the collision." We disagree.

The evidence supports the jury's determination that the vehicle that caused Gomez's death was Lopez's Malibu sedan and that Lopez was the driver at the time of the murder.

Vega testified that Gomez was run over by a "dark vehicle." According to Deputy Gonzales, witnesses at the scene reported that the vehicle that struck the crowd was a "blue Chevy Impala," a "Kia Forte," or a "*Chevy Malibu*," and that its

13

driver was "a Hispanic male wearing jeans and an Astro[s] jersey." (Emphasis added.) Deputy Williams also testified that witnesses identified the suspect as "wearing a blue Astro[s] jersey."

Deputies Gonzales and Williams testified that, during the investigation at the scene, Lopez, wearing a blue, button-up Astros jersey, approached a group of officers from outside the secured perimeter and asked about his mother. He was "very belligerent," had blood on his hands, and appeared to be intoxicated. Photographs of Lopez taken at the scene show him wearing a blue Astros jersey.

An officer asked where Lopez was coming from, and he pointed to a dark-colored sedan parked at the entrance to the parking lot.

Deputy Gonzales examined Lopez's vehicle—a dark blue Chevy Malibu. He noted that there was no one else in or around it. Deputy Gonzales testified: "On the hood I observed hand prints and as I looked by the grill[e] guard I observed speckles of blood and under the vehicle by the drive train on the front there was also blood under the vehicle." Photographs of the hood and front of the Malibu show lines in the dust sweeping down the hood and the front of the car. Deputy Gonzales testified: "Those are the handprints I was talking about."

Deputy Williams testified: "[W]hat I saw . . . was a dirty hood and I observed hand prints sliding down on the front driver portion of that hood."

14

Investigator Davis testified that the Malibu had "apparent front end damage," which he described as follows:

> It's minor and there was some apparent blood on the front bumper and then on the hood you can see where the dust is where it's been disturbed. It looks like something had been—possibly a person dragged across the front. You can see the hand marks.

The grille was damaged and plastic pieces were found "inside" the car.

Deputy Troyer testified that the Malibu had "soft contact damage" that he "would attribute mainly to a pedestrian." He noted that "[t]here was some blood in that same damaged area," and he discussed "wiping of the dust . . . off the hood" that "appeared consistent with contact with a pedestrian." From his investigation, he "determined it definitely did hit a pedestrian."

Detective Vara testified that the Malibu sedan was registered to Lopez.

From the evidence, the jury could have reasonably concluded that Gomez was hit by a Chevy Malibu sedan belonging to Lopez.

On appeal, Lopez complains that there was no DNA evidence connecting his car with the collision. However, direct evidence is not required. *See Carrizales*, 414 S.W.3d at 742.[5]

---

[5] *See also Monroy-Pena v. State*, No. 14-19-00129-CR, 2021 WL 786553, at *5 (Tex. App.—Houston [14th Dist.] Mar. 2, 2021, pet. ref'd) (mem. op., not designated for publication) (holding evidence legally sufficient to support conviction for murder despite lack of DNA evidence connecting defendant to death of complainant); *Pena v. State*, 441 S.W.3d 635, 641 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd)

With respect to the identity of the driver of the Malibu at the time of the murder, Deleon testified that he recognized the car as the same one to which he had seen Lopez escorted moments before it was driven into the crowd. Deleon testified that there were no other cars parked around Lopez's car; it "was the only car there." Deleon saw Lopez get into the driver's side of the car. And, "[s]econds" later— "three, four maximum"—they were struck by the car. Deleon identified Lopez at trial as the same person he had seen getting into the driver's side of the car.

Vega also positively identified Lopez as the person she had seen escorted to the car that hit the crowd:

> Q.    . . . . After the car ran into the people were you able to identify that car?
>
> A.    As the one that pulled away from where he walked, yes.
>
> Q.    So you did see it pull away from there?
>
> A.    Yeah. We were right in front of my vehicle getting ready to leave so when he ran into the crowd he ended up hitting my car.
>
> . . . .
>
> Q.    Did you see the car leave a parking space?
>
> A.    Yes.
>
> Q.    The same car leave that parking space and drive to you guys?
>
> A.    Yes.

She noted that the car was the "only vehicle parked like two spaces over" from where the group had gathered.

---

("The mere absence of DNA and fingerprint evidence does not affect the legal sufficiency of the evidence actually introduced at trial.").

16

Further, in one version of the events that Lopez gave Detective Vara, Lopez admitted having been at the restaurant, knew that his mother had been in a fight in the parking lot, and admitted that he had gotten into his vehicle, i.e., the Malibu, to leave. Thus, Lopez's own account places himself in the Malibu.

Lopez claimed that, once he got into his car, he simply "blacked out." However, the jury could have reasonably chosen to disbelieve this portion of his account to Detective Vara. *See Sharp*, 707 S.W.2d at 614 (jury, as sole judge of facts and credibility, may choose to believe or disbelieve any witness or any portion of their testimony).

Further, there was no evidence presented that anyone other than Lopez got into the Malibu. Vega testified that the man who had escorted Lopez to his car was still on the scene after the car hit the crowd and drove away. And several officers testified that Lopez later returned to the parking lot alone in the Malibu.

From the evidence, the jury could have reasonably inferred that Lopez was the driver of the Malibu at the time that it hit Gomez. *See Ingerson*, 559 S.W.3d at 509 (identity may be proven by circumstantial evidence or by reasonable inferences from the evidence); *Hooper*, 214 S.W.3d at 13 (we defer to factfinder to weigh evidence and to draw reasonable inferences from basic facts to ultimate facts).

Viewing the evidence in the light most favorable to the trial court's judgment, we conclude that the jury could have reasonably found beyond a reasonable doubt

17

that Lopez either intentionally or knowingly caused Gomez's death or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused her death. *See* TEX. PENAL CODE § 19.02(b)(1), (b)(2); *Jackson*, 443 U.S. at 318–19; *Hooper*, 214 S.W.3d at 13. Thus, we hold that the evidence is legally sufficient to support Lopez's conviction for the offense of murder.

### *Failure to Stop and Render Aid*

Section 550.021 of the Transportation Code defines the felony offense of failure to stop and render aid. *See* TEX. TRANSP. CODE § 550.021. Under this provision, the operator of a vehicle involved in a collision that "results or is reasonably likely to result in injury to or death of a person" must:

(1)  immediately stop the vehicle at the scene of the collision or as close to the scene as possible;

(2)  immediately return to the scene of the collision if the vehicle is not stopped at the scene of the collision;

(3)  immediately determine whether a person is involved in the collision, and if a person is involved in the collision, whether that person requires aid; and

(4)  remain at the scene of the collision until the operator complies with the requirements of Section 550.023.

*Id.* § 550.021(a). A person commits an offense if he "does not stop or does not comply with the requirements of this section." *Id.* § 550.021(c).

To comply with section 550.023, the operator must, inter alia, "provide any person injured in the collision reasonable assistance, including transporting or making arrangements for transporting the person to a physician or hospital for

18

medical treatment if it is apparent that treatment is necessary, or if the injured person requests the transportation." *Id.* § 550.023(3).

Thus, the State must prove that the defendant (1) was the driver of a vehicle, (2) who was knowingly involved in a collision that resulted, or was reasonably likely to result, in injury or death, and (3) failed to stop and render reasonable assistance. *Curry v. State*, 622 S.W.3d 302, 309 (Tex. Crim. App. 2019) ("[A] driver must stop and render aid not only if the driver knows that he was involved in an accident and another person was injured or killed, but also if he knows that he was involved in an accident that was reasonably likely to result in injury to or the death of a person." (internal citations omitted)).

Here, with respect to the second element, Deputy Troyer testified that, based on the Malibu's direction of travel in the parking lot and manner in which the Pathfinder was pushed into another car, the act of driving the vehicle into the crowd "seemed intentional"—"because that wouldn't be a way that you would go unless you intended to drive that way." He noted that a Chevy Malibu weighs "[j]ust over 3000 pounds" and that driving a 3000-pound vehicle into a crowd of people was likely to result in injury or death. *See id.*

The testimony also showed that Horedia was injured in the collision and that Deleon suffered serious bodily injury—requiring hospitalization and four

19

surgeries—as well as permanent injury. *See* TEX. TRANSP. CODE. §§ 550.021(a), (c)(1)(B)–(2); *see also* TEX. PENAL CODE § 1.07(a)(46).

With respect to the third element, Vega testified that after the vehicle struck and injured Horedia and Deleon, the driver "put . . . the car in reverse and left the scene" and did not stop. *See Curry*, 622 S.W.3d at 309.

Thus, the jury could have reasonably concluded that the driver of the car was knowingly involved in a collision that resulted, or was reasonably likely to result, in injury or death, and failed to stop and render reasonable assistance. *See id.*

And Lopez concedes in his brief that the evidence establishes that Horeida and Deleon were struck by a vehicle and that the collision "was reasonably likely to injure, and did in fact injure, Horedia and Deleon." He further concedes that the evidence establishes that the driver of the vehicle failed to stop and render aid following the collision.

Again, Lopez argues only that the evidence failed to establish "who drove the offending vehicle," and we disagree. For the reasons discussed above, the jury could have reasonably inferred that Lopez was the driver of the vehicle that struck the crowd—which included Horedia and Deleon. *See id.*; *Ingerson*, 559 S.W.3d at 509 (identity may be proven by circumstantial evidence or by reasonable inferences from the evidence); *see also Caudill v. State*, No. 01-04-00024-CR, 2005 WL 1415343, at *5 (Tex. App.—Houston [1st Dist.] June 16, 2005, pet. ref'd) (mem. op., not

designated for publication) (holding evidence of defendant's identity as driver at time of collision sufficient to support conviction for failure to stop and render aid).

Viewing the evidence in the light most favorable to the trial court's judgment, we conclude that the jury could have found beyond a reasonable doubt that Lopez was the driver of a vehicle, who was knowingly involved in a collision that resulted, or was reasonably likely to result, in injury or death, and failed to stop and render reasonable assistance. *See* TEX. TRANSP. CODE §§ 550.021(a), (c), 550.023; *Jackson*, 443 U.S. at 318–19; *Hooper*, 214 S.W.3d at 13. We thus hold that the evidence is legally sufficient to support Lopez's convictions for the offenses of failing to stop and render aid after a collision resulting in injury and failing to stop and render aid after a collision resulting in serious bodily injury.

We overrule Lopez's sole issue in each cause number.

### Conclusion

We affirm the trial court's judgment in each cause number.


Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Landau and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).

21